# EMPOWER OVERSIGHT
## Whistleblowers & Research


EMPOWR.us

February 12, 2024

**VIA DOJ AND FBI ELECTRONIC PORTALS**

FOIA Public Liaison Stephanie Logan
U.S. Department of Justice
Civil Division
1100 L Street, NW
Washington, DC 20035

Section Chief Michael Seidel
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
200 Constitution Drive
Winchester, VA 22602

RE:   Request for Records Pursuant to the Freedom of Information Act, 5 U.S.C. § 552

Dear FOIA Officer:

## INTRODUCTION

Empower Oversight Whistleblowers & Research ("Empower Oversight") is a nonpartisan, nonprofit educational organization dedicated to enhancing independent oversight of government and corporate wrongdoing. We work to help insiders safely and legally report waste, fraud, abuse, corruption, and misconduct to the proper authorities, and seek to hold those authorities accountable to act on such reports by, among other means, publishing information concerning the same.

## BACKGROUND

Empower Oversight represents Mr. Marcus Allen, a suspended employee of the Federal Bureau of Investigation ("FBI"). Mr. Allen served honorably in the United States Marine Corps from 2000 to 2005 as an intelligence analyst and rifleman.  He received a Top Secret security clearance in 2001. Mr. Allen was deployed to Kuwait and served two tours in Iraq, contributing to Operation Iraqi Freedom. During those deployments Mr. Allen was exposed to live enemy fire

on multiple occasions despite being there to serve in intelligence and analytical roles. The Marine Corps recognized his outstanding military service by awarding him the Navy and Marine Corps Commendation Medal and the Navy and Marine Corps Achievement Medal. In 2004 he was the Marine Corps Intelligence Activity Runner-Up for Intelligence Non-Commissioned Officer of the year.

After being honorably discharged from the Marine Corps in 2005, Mr. Allen worked as an intelligence analyst for several civilian contractors. One of them, SM Consulting/SAIC, provided a support role for the FBI. Through this work, Mr. Allen was hired by the FBI in 2015 as a Staff Operations Specialist in the FBI's Charlotte Field Office. He also accepted collateral duties as a Critical Incident Operation Specialist. Among other responsibilities, he was assigned to provide ad hoc all-source analytic support to Charlotte FBI's Joint Terrorism Task Force ("JTTF"), helping provide it with strategic awareness on any issues that might impact its work.

Mr. Allen has consistently received an "Exceeds Fully Successful" rating on his performance evaluations since he was hired by the FBI. In 2019 the Charlotte Field Office recognized him with its Employee of the Year Award. He also received a time-off award that year. From 2015 to 2021, Mr. Allen was never disciplined or counseled in any form by the FBI.

## MR. ALLEN'S PROTECTED WHISTLEBLOWING

On March 2, 2021, two months after the January 6, 2021 attack on the Capitol, FBI Director Christopher Wray testified before the Senate Committee on the Judiciary for a hearing titled "Oversight of the Federal Bureau of Investigation: the January 6 Insurrection, Domestic Terrorism, and Other Threats."[1] This was Director Wray's first appearance before Congress since the events of January 6, 2021. During questioning by Senator Amy Klobuchar, Director Wray was asked about if he had moments where he thought about if the FBI had known about or could have infiltrated groups that participated in the January 6, 2021 riot. In his response, Director Wray did not disclose that the FBI had infiltrated those groups. Later, when FBI infiltration was confirmed, a number of media outlets, including *The New York Times*, reported about this discrepancy in Director Wray's testimony.[2]

In a subsequent video, a reporter named Darren Beattie from Revolver News discussed the *New York Times* story.[3] Beattie stated:

> *The New York Times* story revealed a very problematic . . . dilemma . . . that the . . . media finds itself in, and this goes all the way back to Christopher Wray. The very first Revolver.News article that started it all began with a sort-of question posed by Senator Klobuchar to Wray. I say 'sort-of question' because she addresses

---

[1] https://www.judiciary.senate.gov/committee-activity/hearings/oversight-of-the-federal-bureau-of-investigation-the-january-6-insurrection-domestic-terrorism-and-other-threats.
[2] *See* Alan Feuer and Adam Goldman, *Among Those Who Marched Into the Capitol on Jan. 6: An F.B.I. Informant*, NEW YORK TIMES (Sept. 25, 2021), *available at* https://www.nytimes.com/2021/09/25/us/politics/capitol-riot-fbi-informant.html; Aram Roston, *EXCLUSIVE Before Jan. 6, FBI collected information from at least 4 Proud Boys*, REUTERS (Apr. 26, 2021), *available at* https://www.reuters.com/world/us/exclusive-before-jan-6-fbi-collected-information-least-4-proud-boys-2021-04-26; Jordan Williams, *FBI had informant in crowd during Capitol riot: report*, THE HILL (Sept. 25, 2021), *available at* https://thehill.com/policy/national-security/fbi/573915-fbi-had-informant-in-crowd-during-capitol-riot-report; Daniel Politi, *FBI Reportedly Had Informant in the Crowd During Capitol Riot*, SLATE (Sept. 25, 2021), *available at* https://slate.com/news-and-politics/2021/09/fbi-informant-crowd-capitol-riot-january.html; Connor Perrett, *A Proud Boys member and FBI informant was texting his handler during the January 6 Capitol riot, report says*, BUSINESS INSIDER (Sept. 25, 2021), *available at* https://www.businessinsider.com/proud-boys-member-was-fbi-informant-at-capitol-riot-nyt-2021-9; Megan VerHelst, *FBI Informant Among Those Who Joined Jan. 6 Capitol Riot: Report*, PATCH (Sept. 25, 2021), *available at* https://patch.com/us/across-america/fbi-informant-among-those-who-joined-jan-6-capitol-riot-report.
[3] https://rumble.com/vn2jzj-capitol-had-uniquely-poor-security-on-jan.-6.html.

the issue of informants, but she assumes the answer to her question. . . . And because she did him the courtesy of not asking the question directly, he dodged the question. But now we know for a fact that there were at least two and likely many, many more informants embedded in the militia groups who were on the ground that day and in the Capitol.[4]

Subsequent reporting has indicated Mr. Beattie's suspicion about more FBI informants being present for the January 6 attack was correct,[5] and continued attention on the issue (including by *The New York Times*) has demonstrated its enduring significance in our understanding of the events of that day.[6]

As the FBI's investigations surrounding January 6 progressed throughout 2021, Mr. Allen periodically shared with his colleagues on the JTTF open source news articles regarding the topic. For example, on July 16, 2021, Mr. Allen sent a lengthy list of FBI employees an email with the subject "FBI Director, Agents Sued in Aftermath Of Jan. 6, Reports Freedom Watch." The email body stated, "Situational awareness," included a link to a Yahoo News story and the following excerpt from the story:

> The complaint, which Is filed as a class action for all persons who were in the nation's capital to peacefully protest, but who in the aftermath of January 6, 2021, have been rounded up, had their homes and businesses violated and broken into, their property such as cell phones and computers seized without probable cause, arrested, prosecuted, denied bail, or some even thrown into solitary confinement while awaiting trial, alleges the violation of First, Fifth and Fourteenth constitutional rights by the defendants.

Shortly after sending the email, Mr. Allen forwarded it to Chief Division Counsel ("CDC") John Ireland. Mr. Allen received no response from CDC Ireland.

After seeing the Mr. Beattie's video regarding Director Wray's testimony, including its reference to the September 25, 2021 *New York Times* article, on September 29, 2021 at 7:51 AM, Mr. Allen sent an email with the subject "6 Jan awareness vid link" to nine of his colleagues: JTTF Supervisory Special Agent Dean Harp, JTTF Principal Relief Special Agent Crecentia Curran, and Supervisory Intelligence Analyst ("SIA") Michael Costanzo, with a CC to CDC Ireland, Associate Division Counsel Kathryn Swinkey, JTTF Intelligence Analyst Amanda

---

[4] *Id.*

[5] *See, e.g.,* Alan Feuer and Zach Montague, *In Proud Boys Jan. 6 Sedition Trial, F.B.I. Informants Abound*, NEW YORK TIMES (Mar. 24, 2023), *available at* https://www.nytimes.com/2023/03/24/us/proud-boys-fbi-informants.html ("Over the past two months, one subject has repeatedly come up at the trial of five Proud Boys accused of sedition in connection with the storming of the Capitol: the unusual number of informants that the F.B.I. had in or near the group."); Miranda Devine, *FBI lost count of how many paid informants were at Capitol on Jan. 6, and later performed audit to figure out exact number: ex-official*, NEW YORK POST (Sept. 19, 2023), *available at* https://nypost.com/2023/09/19/fbi-lost-count-of-number-of-informants-at-capitol-on-jan-6-ex-official ("The FBI had so many paid informants at the Capitol on Jan. 6, 2021, that it lost track of the number and had to perform a later audit to determine exactly how many 'Confidential Human Sources' run by different FBI field offices were present that day, a former assistant director of the bureau has told lawmakers.").

[6] *See, e.g.,* Alan Feuer and Adam Goldman, *F.B.I. Had Informants in Proud Boys, Court Papers Suggest*, NEW YORK TIMES (Nov. 14, 2022), *available at* https://www.nytimes.com/2022/11/14/us/politics/fbi-informants-proud-boys-jan-6.html; Ryan J. Reilly, *Informant warned FBI weeks before Jan. 6 that the far right saw Trump tweet as 'a call to arms'*, NBC NEWS (Dec. 21, 2022), *available at* https://www.nbcnews.com/politics/justice-department/informant-warned-fbi-weeks-jan-6-far-right-saw-trump-tweet-call-arms-rcna62683; Tess Owen, *FBI Informants Who Marched With Proud Boys on Jan. 6 Will Testify for Their Defense*, VICE NEWS (Jan. 13, 2023), *available at* https://www.vice.com/en/article/5d3vyd/proud-boys-trial-fbi-informants-testify-defense; Michael Kunzelman and Lindsay Whitehurst, *Federal prosecutors reveal Proud Boys witness was informant*, ASSOCIATED PRESS (Mar. 22, 2023), *available at* https://apnews.com/article/proud-boys-enrique-tarrio-capitol-riot-informant-ce0a1cf20c17c95b1ea3306fb70d93c4.

Shuford, JTTF Intelligence Analyst Alexis Court, JTTF Special Agent Felix Del Toro Silva, and Raleigh Resident Agency Intelligence Analyst Colleen Hickman. The link was to Mr. Beattie's video.

Mr. Allen emailed the same recipients approximately one hour later, at 8:47 AM, with the subject "6 Jan awareness." This email read:

> There is a significant counter-story to the events of 6 January 2021 at the US Capitol. There is a good possibility the DC elements of our organization are not being forthright about the events of the day or the influence of government assets. . . . The information presented in the linked video and seconded by the New York Times raises serious questions about the nature of government involvement at the US Capitol on 6 January 2021.

In contrast to its responses to Mr. Allen's previous emails about January 6 investigations, his leadership reacted dramatically to his September 29, 2021 emails.

Following Mr. Allen's second email, SIA Costanzo asked Mr. Allen to come to his office. When he entered, his Assistant Special Agent in Charge ("ASAC") Jason Kaplan was also in the office. In that meeting, ASAC Kaplan told Mr. Allen that CDC Ireland was very upset about Mr. Allen's emails that day. Mr. Allen proceeded to disclose in even more detail his concerns about the truthfulness of Director Wray's testimony to Congress because of his failure to correct the premise in Senator Klobuchar's question and because her premise—that the FBI had failed to infiltrate the groups at the Capitol on January 6—was now being debunked as false. Mr. Allen said he was merely trying to ensure the Charlotte JTTF had strategic awareness of potential problems within the FBI.

At the end of the meeting, ASAC Kaplan and SIA Costanzo communicated to Mr. Allen that they appreciated his point of view, and they considered the matter resolved. After the meeting, SIA Costanzo further divulged to Mr. Allen one-on-one that CDC Ireland had been so upset he contacted ASAC Kaplan directly without involving SIA Costanzo, Mr. Allen's supervisor. SIA Costanzo gave Mr. Allen a friendly warning that the situation could lead to further issues for Mr. Allen in the future.

Mr. Allen's email and follow-up conversation with SIA Costanzo and ASAC Kaplan constituted a disclosure of his belief that the FBI Director may have violated a law, rule, or regulation, or engaged in gross mismanagement or an abuse of authority. Lying to Congress is a violation of 18 U.S.C. 1001, which prohibits, "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . falsif[y], conceal[], or cover[] up by any trick, scheme, or device a material fact; [or] make[] any materially false, fictitious, or fraudulent statement or representation." Even if Director Wray did not commit a crime, he may have lacked candor in his testimony, abused his authority, or engaged in gross mismanagement by negligently misleading Congress.

Mr. Allen's own ASAC observed that Mr. Allen's concern over the Director's testimony was reasonable. In fact, ASAC Kaplan reported that Mr. Allen had firsthand knowledge calling Director Wray's testimony into question. According to the record the FBI subsequently provided to Mr. Allen ("Clearance File"), the ASAC recounted in an interview with the FBI's Security Division (SecD): "For the most part, Allen's stated motivation for sending the email appeared reasonable . . . . Allen's position on the matter was likely influenced by his knowledge [Charlotte Field Office] *did* have a source at the Capitol, who was reporting *as the events unfolded* on January 6." Clearance File at 99 (emphasis added).

That the FBI understood Mr. Allen to have made a protected disclosure on September 29, 2021 is indicated by ASAC Kaplan's statement in a November 17, 2021 interview: "Allen remains assigned to the JTTF, as the FBI Office of General Counsel cautioned [Charlotte] to avoid taking action which could be interpreted as retaliatory." *Id*. at 99-100.

## FBI RETALIATION AGAINST MR. ALLEN IN VIOLATION OF WHISTLEBLOWER PROTECTIONS

By disclosing in good faith to supervisors in his direct chain of command his reasonable belief that Director Wray may have misled Congress, Mr. Allen's September 29, 2021 communications were protected under 5 U.S.C. § 2303, 50 U.S.C. § 3341(j)(1), 28 C.F.R. § 27.2, and Presidential Policy Directive/PPD-19 ("PPD-19) § B. However, as a reprisal for Mr. Allen's protected disclosure, the FBI not only initiated an investigation into his security clearance and suspended his clearance, in violation of 50 U.S.C. § 3341(j)(1) and PPD-19, it *also* suspended him from duty indefinitely without pay—a "personnel action" as defined by 5 U.S.C. § 2302(a)(2)(A)(ix), in violation of the above cited whistleblower protections.

The Clearance File demonstrates that the entire security investigation into Mr. Allen was predicated solely upon his protected disclosure because it reversed a favorable security clearance recommendation the Bureau had just made in Mr. Allen's favor. The FBI appears to have completed a Tier 5 reinvestigation of Mr. Allen on September 29, 2021. *Id*. at 550. It concluded: "Based on this review, it is recommended that captioned subject's reinvestigation be closed favorably. Subject remains eligible for a Top Secret security clearance and continued access to FBI space." *Id*. This document was approved by SecD on September 30, 2021. *Id*. at 549.

Yet on the same day, Charlotte's CDC forwarded Mr. Allen's September 29, 2021 email to FBI's Office of General Counsel, which in turn forwarded the email to SecD. *Id*. at 70. The FBI's "Opening EC – Marcus O'Ryan Allen" states that Mr. Allen's September 29, 2021 email was the sole basis for the Charlotte Field Office's Chief Security Officer sending a security referral on September 30, 2021. *Id*. at 4-5. SecD appears to have initiated its "Opening EC" on October 19, 2021. *Id*. at 3, 1679.

In a series of phone interviews on November 17, 2021, Mr. Allen's supervisory chain all made clear that they had no concerns about Mr. Allen's allegiance to the United States. *Id*. at 82, 89, 94, 99. Rather, they objected to his September 29 email because it accused FBI leadership of wrongdoing—the very heart of protected whistleblower activity.

SIA Costanzo stated he believed the September 29 email "crossed the line" because "it was inappropriate for Allen to have included accusatory language toward the leadership of the FBI . . . ."

Mr. Allen's Supervisory Special Agent ("SSA") stated he "felt it was out of line for Allen to have insinuated in the [September 29] email FBI leadership was lying," and that Mr. Allen "overstepped." *Id*. at 94.

Mr. Allen's ASAC indicated his concern was specifically about Mr. Allen disclosing his concern about FBI leadership forthrightness—even though, as he told the interviewer, "Allen's stated motivation for sending the email appeared reasonable." *Id*. at 98-99.

The Charlotte CDC told SecD that "what was unusual to [him] regarding the September 29, 2021 email he received from Allen regarding January 6[] was it included conclusions and direction as opposed to simply relaying open source information"—specifically, his statement about the forthrightness of the FBI's "DC elements." *Id*. at 88-89.

Just as Mr. Allen's protected disclosure was the sole predication for the clearance investigation, it was the central basis for the FBI's suspension of his security clearance, as evidenced by the eight-page "Clearance Suspension EC" of January 10, 2022. Every substantive page of the Clearance Suspension EC references Mr. Allen's September 29, 2021 email. *Id.* at 321-28. The EC cited "his questioning of the honesty of FBI leadership," *id.* at 325, and expanded on the fact Mr. Allen believed Director Wray might have perjured himself in his testimony before Congress, *id.* at 326.

Given the centrality of Mr. Allen's protected whistleblower disclosure of September 29, 2021 to his security clearance investigation and given that the FBI chose to indefinitely suspend Mr. Allen from duty without pay relying solely on that clearance review, those FBI actions were in reprisal for his protected whistleblowing in violation of law, regulation, and presidential directive.

**OTHER UNLAWFUL FBI ACTIONS DESIGNED TO CAUSE MR. ALLEN SEVERE FINANCIAL DISTRESS WHILE HE WAS SUSPENDED FROM DUTY WITHOUT PAY**

The FBI has made other unlawful decisions that aggravate Mr. Allen's financial distress by depriving him of other sources of income while he has been suspended indefinitely without pay. The crux of the FBI's unlawful actions to interfere with Mr. Allen's ability to obtain another income is that—although the FBI has suspended Mr. Allen from all duties for *two years* and has stated its intention to revoke his clearance and never return him to a duty status—it simultaneously claims that he remains an "employee" subject to various FBI restrictions and approvals necessary for outside income. The FBI's claim is plainly contrary to the statutory definition of a federal employee. The law defines a federal employee as someone who, among other things, is "*engaged in the performance* of a Federal function under authority of law or an Executive act; and…subject to the supervision of an individual…while *engaged in the performance of the duties* of his position." 5 U.S.C. § 2105(a)(2),(3).

In defiance of this statutory definition, the FBI baldly asserts the authority to require Mr. Allen to obtain permission from the FBI before accepting outside employment. When he asked for such permission, the FBI unreasonably delayed responding to Mr. Allen's good faith request for permission, causing him to lose an opportunity to mitigate the loss of his FBI income and causing him significant financial harm.

On April 6, 2023, more than a year after his suspension from duty without pay, Mr. Allen contacted the FBI about obtaining "outside employment." Even though the FBI was not paying him, it instructed Mr. Allen that he was required to follow FBI and DOJ outside employment rules, which mandated that he obtain permission before taking another job. Mr. Allen received the required ethics clearance from FBI Office of Integrity and Compliance ("OIC") Ethics and Integrity Unit Chief Chenail to submit his request through his Charlotte Division chain of command for approval. He submitted his request on April 14, 2023. Although the FBI outside employment request form states that the requester must be informed of a decision within fifteen business days, Mr. Allen received no response in that period. The application period for the position Mr. Allen sought closed on May 29, 2023.

On July 18, 2023, Empower Oversight and other counsel for Mr. Allen had a phone call with DOJ Civil Division Personnel regarding Mr. Allen's case. In that call, they inquired as to why Mr. Allen did not receive a response to his outside employment request within the required 15 days. Records show that after that call, the Charlotte Special Agent in Charge subsequently approved Mr. Allen's request one week later, on July 26, 2023. Charlotte Division personnel did not bother to notify Mr. Allen of the approval until September 5, 2023. The FBI's delay in considering his request, in violation of its own rules, caused him to lose an employment opportunity.

# RECORDS REQUEST

In order to shed light on possible FBI and DOJ wrongdoing as well as law enforcement policy, specifically the FBI and DOJ's handling of requests from individuals who have been suspended from duty without pay to take outside employment, which causes those individuals substantial further financial distress, Empower Oversight requests the following records pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552:

1. All records in the custody of any FBI employee or official ranked as a GS-14 or higher, or an appointee, or any agent or immediate staff of any such person, created in the past two (2) years, regarding the FBI's position or policy that individuals on unpaid suspension are required to receive FBI approval for outside employment requests during the pendency of the suspension.

2. Records of any communications, during the period from April 5, 2023 through September 5, 2023, by or with any FBI Office of Integrity and Compliance personnel including, but not limited to, Catherine Bruno, Betty DeVall, Kevin Chenail, and Margaret Davis, discussing Marcus Allen and outside employment.

3. Records of any communications, during the period from April 5, 2023 through September 5, 2023, by or with any DOJ Civil Division personnel including, but not limited to, Sarah Suwanda and Christopher Hall, discussing Marcus Allen and outside employment.

4. Records of any communications, during the period from April 5, 2023 through September 5, 2023, by or with any FBI Charlotte Division personnel including, but not limited to, Special Agent in Charge Robert Wells, Chief Division Counsel John Ireland, Associate Division Counsel Kathryn Swinkey, Assistant Special Agent in Charge Jason Kaplan, Supervisory Intelligence Analyst Michael Costanzo, and Chief Security Officer Suzanne Pemleton, discussing Marcus Allen and outside employment.

**Mr. Allen has executed a Form DOJ-361 authorizing the release of information to Empower Oversight, which is attached as Exhibit A**.

## DEFINITIONS

"COMMUNICATION(S)" means every manner or method of disclosure, exchange of information, statement, or discussion between or among two or more persons, including but not limited to, face-to-face and telephone conversations, correspondence, memoranda, telegrams, telexes, email messages, voice-mail messages, text messages, Slack messages, meeting minutes, discussions, releases, statements, reports, publications, and any recordings or reproductions thereof.

"DOCUMENT(S)" or "RECORD(S)" mean any kind of written, graphic, or recorded matter, however produced or reproduced, of any kind or description, whether sent, received, or neither, including drafts, originals, non-identical copies, and information stored magnetically, electronically, photographically or otherwise. As used herein, the terms "DOCUMENT(S)" or "RECORD(S)" include, but are not limited to, studies, papers, books, accounts, letters, diagrams, pictures, drawings, photographs, correspondence, telegrams, cables, text messages, emails, memoranda, notes, notations, work papers, intra-office and inter-office communications, communications to, between and among employees, contracts, financial agreements, grants, proposals, transcripts, minutes, orders, reports, recordings, or other documentation of telephone or other conversations, interviews, affidavits, slides, statement summaries, opinions, indices, analyses, publications, questionnaires, answers to questionnaires, statistical records,

ledgers, journals, lists, logs, tabulations, charts, graphs, maps, surveys, sound recordings, data sheets, computer printouts, tapes, discs, microfilm, and all other records kept, regardless of the title, author, or origin.

"PERSON" means individuals, entities, firms, organizations, groups, committees, regulatory agencies, governmental entities, business entities, corporations, partnerships, trusts, and estates.

"REFERS," "REFERRING TO," "REGARDS," REGARDING," "RELATES," "RELATING TO," "CONCERNS," "BEARS UPON," or "PERTAINS TO" mean containing, alluding to, responding to, commenting upon, discussing, showing, disclosing, explaining, mentioning, analyzing, constituting, comprising, evidencing, setting forth, summarizing, or characterizing, either directly or indirectly, in whole or in part.

"INCLUDING" means comprising part of, but not being limited to, the whole.

## INSTRUCTIONS

The words "and" and "or" shall be construed in the conjunctive or disjunctive, whichever is most inclusive.

The singular form shall include the plural form and vice versa.

The present tense shall include the past tense and vice versa.

In producing the records described above, you shall segregate them by reference to each of the numbered items of this FOIA request.

If you have any questions about this request, please contact Mike Zummer by e-mail at mzummer@empowr.us.

## FEE WAIVER REQUEST

Empower Oversight agrees to pay up to $25.00 in applicable fees, but notes that it qualifies as a "representative of the news media" and requests a waiver of any fees that may be associated with processing this request, in keeping with 5 U.S.C. § 552 (a)(4)(A)(iii).

Empower Oversight is a non-profit educational organization as defined under Section 501(c)(3) of the Internal Revenue Code, which helps insiders safely and legally report waste, fraud, abuse, corruption, and misconduct to the proper authorities, and seeks to hold those authorities accountable to act on such reports by, among other means, publishing information concerning the same.

Further, the information that Empower Oversight seeks is in the public interest because it is likely to contribute significantly to the public's understanding of the Department's handling of allegations that it or its employees was negligent or engaged in wrongdoing.

Empower Oversight is committed to government accountability, public integrity, and transparency. In the latter regard, the information that that Empower Oversight receives that tends to explain the subject matter of this FOIA request will be disclosed publicly via its website, and copies will be shared with other news media for public dissemination.

      For ease of administration and to conserve resources, we ask that documents be produced in a readily accessible electronic format. Thank you for your time and consideration. Please do not hesitate to contact me with any questions.

                                        Cordially,

                                        /Tristan Leavitt/
                                        Tristan Leavitt
                                        President